**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. JOSUE ISRAEL COVARRUBIAS FELIX, Defendant. | **MEMORANDUM DECISION AND ORDER** Case No. 2:12-cr-00315-DB-PMW Judge Dee Benson |

This matter is before the court on defendant's motion to suppress filed on July 30, 2012. (Dkt. No. 12.) The court held an evidentiary hearing on the motion on November 30, 2012. Defendant Josue Israel Covarrubias Felix was represented by Robin K. Ljungberg. The government was represented by Robert C. Lunnen. Following the hearing, the court ordered a transcript and supplemental briefing from the parties. After review and consideration of the briefs submitted by the parties, along with the evidence and testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

**BACKGROUND**

The court finds the following relevant facts.[1] On May 13, 2012, Michael Bradford was a Trooper for the Utah State Highway Patrol. (Tr. at 5.) Trooper Bradford had been with the Utah Highway patrol for eight years. (Id.) Prior to working with the Highway Patrol, Trooper Bradford worked for the San Juan County Sheriff's Office as a dispatcher, a corrections officer,

---

[1] Reference to the transcript of the evidentiary hearing conducted on November 30, 2012, will be cited as "Tr. at __."

1

and a peace officer. (Id.) Trooper Bradford also had work experience with the San Juan County Drug Task Force. (Tr. at 6.) He was a member of the Highway Patrol's statewide drug interdiction team. (Id.) In the course of his career, Trooper Bradford received formal training regarding locating hidden compartments within commercial vehicles. (Id.) He also had personal experience in approximately twenty cases in which suspects had secreted illegal narcotics in hidden compartments. (Tr. 6-9.)

On May 13, 2012, Trooper Bradford observed a Mercedes Benz SUV with a Minnesota license plate traveling northbound on Highway 191 at about 81 mph in a 65 mph zone. (Tr. at 10-11.) Bradford stopped the vehicle for speeding at 8:49 a.m. (Id.) When both vehicles were stopped safely off the road, Trooper Bradford exited his patrol vehicle and contacted the driver of the SUV. (Tr. at 12.) Trooper Bradford told the driver that he had stopped him for traveling 81 mph in a 65 mph zone. (Id.) The driver acknowledged that he had been speeding and apologized (Tr. at 12.)

Trooper Bradford asked the driver to produce his license and registration. (Tr. at 12-13). While the driver was retrieving the requested documentation, Trooper Bradford asked him where he was coming from and where he was going. (Tr. at 13.) In response, the driver reached down and grabbed a pendant that he was wearing, put it up to his lips, and kissed it. (Tr. at 16). Trooper Bradford noted that the pendant was a depiction of "Santa Muerte," the grim reaper, which Trooper Bradford knew was often worn by individuals involved in drug trafficking. (Tr. at 15.) The driver told Trooper Bradford that he was on his way to Minneapolis, Minnesota from Phoenix, Arizona for a "singing gig." (Tr. at 13.)

When Trooper Bradford received the requested documents, he identified the driver by his

2

license as the defendant, Josue Israel Covarrubias Felix. (Tr. at 11; Govt's Ex. 1) Trooper Bradford noted that the defendant's driver's license was issued in Arizona approximately two weeks prior to the day of the traffic stop. (Id.) He also observed that the vehicle was registered and insured in another person's name out of Minnesota. (Tr. at 11; Govt's Ex.'s 2-3.) Trooper Bradford asked the defendant who owned the vehicle. (Tr. at 13.) The defendant said that the vehicle belonged to his friend, Hector. (Tr. at 13.) When Trooper Bradford asked the defendant what Hector's last name was, the defendant said he did not know. (Tr. at 13.) Trooper Bradford was troubled by the fact that the vehicle was owned by a third party and that the defendant did not know the owner's last name. Trooper Bradford testified at the evidentiary hearing that, in his experience, "it was typical with previous pipeline cases" for the driver not to know the owner of the vehicle or to only be able to identify the first name of the registered owner. (Tr. at 14.)

Trooper Bradford's initial roadside encounter with the defendant lasted approximately two minutes. (Tr. at 18; Govt's Ex. 6.) During these two minutes, Trooper Bradford noted several other details which he identified as "red flags" during the evidentiary hearing. (Id.) He noticed two cellular phones on the console, an empty red bull can on the front passenger's floorboard, a single key in the ignition without accompanying keys on a ring, and the defendant's appearance of extreme fatigue. (Tr. at 14-15, 37.)

At this point, Trooper Bradford asked the defendant if he would be willing to accompany him back to the patrol car and sit with him there. (Tr. at 18.) The defendant answered affirmatively and followed Trooper Bradford back to the patrol car. (Id.) While walking to the patrol car, Trooper Bradford asked the defendant whether he had any weapons. (Id.) The defendant answered that he did not. (Id.) Trooper Bradford then asked the defendant for

permission to conduct a quick pat down, which the defendant granted. (Id.) Once Trooper Bradford and the defendant were seated in the patrol car, Trooper Bradford began asking the defendant for information necessary to complete the speeding citation, including his name, date of birth, height, weight, social security number, and place of birth. (Tr. at 18-20.) Trooper Bradford also called dispatch to inform them that he was out on a vehicle stop and to request driver's license and registration information from the dispatcher. (Tr. at 19.) While he entered this information on his vehicle's computer, Trooper Bradford and the defendant engaged in additional conversation. (Tr. 20-21) Trooper Bradford again asked the defendant about his travel plans. (Id.) The defendant stated again that he was en route to Minneapolis to attend a "singing gig." (Tr. at 21.) When asked whether he played a musical instrument, the defendant stated that he played a 12-string instrument called a Bajo Sexto. (Id.) Having noticed that there was no instrument visible in the vehicle when he had approached it earlier, Trooper Bradford asked where the instrument was. (Id.) The defendant told him that the instrument was awaiting him in Minneapolis. (Id.) Trooper Bradford then asked the defendant where the owner of the vehicle was and how the vehicle ended up in Phoenix. (Id.) Initially, the defendant stated that the owner had driven the vehicle to Phoenix and taken a flight back to Minneapolis, leaving the vehicle behind. (Id.) At the evidentiary hearing, Trooper Bradford testified that he was "a little skeptical" of the defendant's answers to his questions. (Id.) The defendant later altered his answer and said that he had gone to Minneapolis himself and driven the car back to Phoenix. (Id.) Defendant stated that he had been in possession of the vehicle for two months. (Id.)

At this point, Trooper Bradford observed that the defendant appeared to be "very, very nervous." (Id.) Trooper Bradford noted that the defendant's carotid artery was "beating out of

4

control." (Tr. at 22.) At the evidentiary hearing, Trooper Bradford explained that while most individuals are visibly nervous during a traffic stop, their carotid arteries generally cease to beat visibly enough to indicate extreme nervousness after a few minutes of sitting in the patrol vehicle. (Id.) Trooper Bradford testified that this was not the case with the defendant, who remained extremely nervous throughout the entire stop, as indicated by the conspicuous pulse of his carotid artery. (Id.) Trooper Bradford also observed the defendant kissing his pendant of the Santa Muerte while they sat in the patrol car. (Id.) After the defendant kissed his pendant this second time, Trooper Bradford called dispatch for backup. (Id.)

About twelve minutes into the stop, Bradford was concerned that the defendant was unable to completely understand some of his questions because of the language barrier between them. (Id.) Trooper Bradford called dispatch to see if he could procure a Spanish speaker to help translate. (Id.) Trooper Bradford was ultimately able to reach Deputy Sheriff John Young, a Spanish speaker, by cell phone. (Id.) Trooper Bradford advised Deputy Sheriff Young of the situation and "asked him if he could confirm" the answers to some of the questions he had asked the defendant. (Id.) Deputy Sheriff Young then began the process of translating for Trooper Bradford over the phone. (Tr. at 51.) The initial cell phone connection with Deputy Sheriff Young was poor, so they hung up and initiated a second call which was of better quality. (Tr. at 52-53.) Young spoke with the defendant for approximately ten minutes during which he asked several of the questions that Trooper Bradford had already asked the defendant, translating the defendants' answers from Spanish into English for Bradford. (Tr. at 52.)

During the course of the conversation in the patrol vehicle, Trooper Bradford testified that he believed that the defendant's "story was not adding up." (Tr. at 23.) As mentioned above,

the defendant told the trooper that he was going to a "singing gig" to play the bajo-sexto, despite the fact that the instrument was not in his vehicle. (Tr. at 23.) The defendant also told Trooper Bradford that he might not return to Phoenix because he had run out of work there. (Tr. at 24.) Trooper Bradford found this statement to be strange given the fact that when he had initially approached the defendant's vehicle, he had observed only one small suitcase in the cargo area, rather than the vehicle full of luggage that he would have expected for someone who intended to permanently relocate. (Id.)

Toward the end of the conversation, Trooper Bradford had Deputy Sheriff Young ask the defendant whether the he was "involved in any criminal activity, if he had any cocaine, marijuana or methamphetamine or heroin" in the vehicle. (Tr. at 24.) The defendant responded, saying no. (Tr. at 24.) Trooper Bradford then asked Deputy Sheriff Young to ask if the defendant would grant Trooper Bradford permission to search his vehicle. (Id.) Defendant answered, "Claro, no problemo" which means, "Of course, no problem." (Tr. at 24, 55.) At this point, the entire stop had lasted approximately twenty-two minutes. (Tr.at 24-25.) During the evidentiary hearing, Bradford testified that his average traffic stop to issue a speeding citation lasts fifteen to twenty minutes. (Tr. at. 25.)

Trooper Bradford then had Deputy Sheriff Young ask Mr. Felix if he would be willing to sign a written agreement in Spanish giving permission for the search. (Id.) Trooper Bradford had Deputy Sheriff Young explain the contents of the agreement. (Id.) Trooper Bradford then had the defendant read the Spanish agreement out loud, following which the defendant signed the agreement. (Id.; Govt's Ex. 5.)

Trooper Bradford searched the vehicle with another trooper who had arrived at the scene

6

while the defendant sat on the side of the road. (Tr. at 26-27.) During the initial search, the troopers noticed "tooling and scratch marks" indicating to them that the vehicle panels and parts had been removed several times. (Tr. at 27.) Trooper Bradford also observed an approximately half-foot of space between the floor of the cargo area and the bottom of the vehicle. (Tr. at 27-28.) At the evidentiary hearing Trooper Bradford testified that cars are generally not built with such a space between the bottom of the floor of the cargo area and the bottom of the vehicle. (Tr. at 28.) Trooper Bradford examined this space more closely by looking under vehicle, where he noticed a "freshly rubberized" covering that had been placed over the undercarriage of the vehicle that "wasn't factory." (Tr. at 28-29.) Trooper Bradford noted that the covering appeared to have "been blown on with a plaster gun that you use for plastering at home." (Tr. at 28.)

At this point, Trooper Bradford decided that he needed to take the vehicle to the closest shop to give him better access to the undercarriage. (Tr. at 30.) However, prior to moving the vehicle, he asked another trooper to conduct a canine search. (Tr. at 32.) The canine officer arrived at the location approximately one hour after the initial stop. (Tr. at 32.) After the canine search, the canine officer told Trooper Bradford that the canine search indicated the presence of narcotics in the left rear panel of the vehicle. (Tr. at 32.) The vehicle was then taken to a shop where troopers located six kilograms of a white powder in a compartment located between the floor of the cargo area and the undercarriage. (Tr. at 30-31.) According to a substance field test, the powder tested positive as cocaine. (Tr. at 31.)

## DISCUSSION

The defendant does not challenge the legality of the initial traffic stop. However, the defendant argues that Trooper Bradford impermissibly expanded the scope of the initial traffic

7

stop for speeding and thereby violated the defendant's rights under the Fourth Amendment because there were was no reasonable suspicion of criminal activity given the totality of the circumstances. The court disagrees, and finds that Trooper Bradford had objectively reasonable, articulable suspicion that the defendant was engaged in criminal activity sufficient to justify expanding the scope of his initial stop.

### I. The Initial Traffic Stop

A routine traffic stop is a limited seizure within the meaning of the Fourth Amendment more akin to an investigative <u>Terry</u> stop than to a custodial arrest. <u>United States v. Jones</u>, 44 F.3d 860, 871 (10th Cir. 1995). Therefore, the reasonableness of a traffic stop is assessed under the two-prong analysis set forth in <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968). Under the <u>Terry</u> analysis, the court makes a dual inquiry, determining first whether the stop was justified at its inception, and second, whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." <u>Id.</u>; <u>United States v. Williams</u>, 271 F.3d 1262, 1266 (10th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1019 (2002). Once the purpose of the stop is completed, "further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1) the officer has objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter." <u>United States v. Cervine</u>, 347 F.3d 865, 868-69 (10th Cir. 2003).

A traffic stop "is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" <u>Unites States v. Ramstadt</u>, 308 F.3d 1139,

8

1144 (10th Cir. 2002) (quoting United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999)(internal citations omitted)). In the present case, it is uncontroverted that Trooper Bradford saw the defendant's vehicle traveling 81 mph in a 65 mph zone.[2] Therefore, the stop was justified at its inception.

Having determined that the traffic stop was justified at its inception, the court determines that Trooper Bradford's actions during the detention were reasonably related in scope to the circumstances justifying the initial stop until he formulated a reasonable suspicion justifying the expansion of his investigation. See, Terry, 392 U.S. at 20; Cervine, 347 F.3d at 868-69. The Tenth Circuit has recognized that an officer conducting a routine traffic stop may detain a driver while requesting a driver's licence, vehicle registration and proof of insurance. United States v. Polly, 630 F.3d 991 (10th Cir. 2011) (quoting United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993)); see also, United States v. Pena-Montes, 589 F.3d 1048, 1059 (10th Cir. 2009). An officer may run computer checks on: (1) the driver's license, (2) the vehicle registration, (3) other proof of authorization to operate the vehicle, (4) outstanding warrants on the driver, and (5) whether the vehicle has been reported stolen. United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997); see also United States v. Taverna, 348 F.3d 873, 877 (10th Cir. 2003). An officer may detain the driver and vehicle as long as reasonably necessary to make these determinations or to issue a citation or warning. Mendez, 118 F.3d at 1429. Questions unrelated to the purpose of the stop do not violate the scope and length of the initial detention as long as the questions do not prolong the length of the detention. United States v. Davis, 636 F.3d 1281, 1290 (10th Cir.

---

[2]Utah law provides that traveling at any speed in excess of the limits established by statute is prima facie evidence that the speed isunlawful. Utah Code Ann. §41-6a-601.

2011) (citing United States v. Karam, 496 F.3d 1157, 1161 (10th cir. 2007)). The officer may only pursue "further detention for purposes of questioning unrelated to the initial traffic stop" if "(1) the officer has objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter. Cervine, 347 F.3d 865, 868-69 (10th Cir. 2003).

Trooper Bradford did not impermissibly detain the defendant or exceed the scope of the initial detention. The record establishes that only twenty-two minutes elapsed between the initiation of the stop and the acquisition of permission to search the vehicle. (Tr. 24-25.) During those twenty-two minutes, Trooper Bradford requested the permitted documents, ran checks on them, and communicated with the defendant through an interpreter. Trooper Bradford's inquiry into defendant's travel plans was reasonable according to the Tenth Circuit, which has held that "questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of the traffic stop." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). It was during the course of these permissible activities that Trooper Bradford observed a number of details which led him to an objectively reasonable and articulable suspicion that criminal activity was occurring, which justified his expansion of the scope of his investigation. Therefore, Trooper Bradford did not unreasonably expand the scope of the initial detention.

### II. **Objectively Reasonable and Articulable Suspicion**

Trooper Bradford observed facts which, based on his experience and training in drug interdiction, created a reasonable and articulable suspicion that the defendant was transporting narcotics. In formulating an objectively reasonable and articulable suspicion, officers may "draw

10

on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002)(internal citations omitted). While the observation of one fact that considered alone would not give an officer sufficient reasonable suspicion to justify expanding his investigation into other illegal activity, a combination of multiple, seemingly harmless factors can create reasonable suspicion under the totality of the circumstances. Id.; United States v. Davis, 636 F.3d 1281, 1290-91 (10th Cir. 2011).

Trooper Bradford cited a number of reasons for his suspicion of criminal activity that he observed during his initial encounter with the defendant at the evidentiary hearing. When he first approached the defendant's vehicle, he observed that there was only one key in the ignition of the vehicle, there were two cell phones on the console, and there was a can of red bull on the floor. (Tr. at 14-16, 37.) While these details may not be indicative of criminal behavior to the untrained observer, they were "red flags" to Trooper Bradford as a result of his training and experience. (Tr. at 14.) As Trooper Bradford reviewed the defendant's license and the vehicle's registration and insurance information, Trooper Bradford observed other facts and circumstances which heightened his suspicion of criminal activity. (Tr. at 13-16.) He noted that the defendant was not the owner of the vehicle. (Tr. at 13.) In Trooper Bradford's prior experience with drug traffic stops or pipeline cases, the driver of the vehicle transporting narcotics was often not the vehicle's owner. (Tr. at 14.) Other factors contributing to Trooper Bradford's reasonable suspicion were the defendant's inability to identify the surname of the vehicle's owner, the defendant's apparent extreme fatigue, and the fact that the defendant had only received his license two weeks prior to the stop. (Tr. 13, 15, 18.) Another significant fact supporting Trooper

Bradford's reasonable suspicion was the defendant's pendant depicting "Santa Muerte" or Saint Death. (Tr. at 15.) Trooper Bradford was aware that the image of Santa Muerte is often used by criminals and drug traffickers. (Tr. at 15.).[3] During their initial conversation, Trooper Bradford noted that the defendant kissed the pendant when asked about his travel plans. (Tr. at 16.) All of these factors were observed by Trooper Bradford during his initial exchange with the defendant which lasted about two minutes. (Tr. at 18.) The accumulation of these objective facts and circumstances observed in the first two minutes of the stop alone justify Trooper Bradford's objectively reasonable suspicion that the defendant was engaged in the transporting of narcotics or some other criminal activity. See Arvizu, 534 U.S. at 273; Davis, 636 F.3d at 1290-9; see also United States v. Wood, 106 F.3d 942 (10th Cir. 1997) (stating that "deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions.") This reasonable suspicion enabled Trooper Bradford to expand the scope of the stop and his investigation. See United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007).

After the initial two minutes, Trooper Bradford observed several more factors adding to his suspicion while the defendant was sitting in his patrol car. While Trooper Bradford was entering information onto his computer in the course of checking the defendant's documentation, he asked the defendant further questions which led to the defendant's inconsistent and suspect statements concerning his travel plans and his excessively nervous behavior that included kissing the Santa Muerte pendant again. (Tr. at 22-24.) As a result of Trooper Bradford's

---

[3] The image of Santa Muerte has been recognized in other cases as being linked to drug trafficking or criminal activity. See United States v. Pena Ponce, 588 F.3d 579 (8th Cir. 2009); See also United States v. Beltran-Aguilar, 412 Fed. Appx. 171 (10th Cir. 2011); United States v. Goxcon-Chagal, __F. Supp. 2d __, 2012 WL 3249467 (D. N. M.).

12

observations of the defendant's behavior in the patrol car and his observations during the first two minutes of the stop, Trooper Bradford asked the defendant if he possessed any weapons or narcotics. After the defendant answered no, Trooper Bradford attained the signed consent form to allowing him to search the vehicle resulting in the discovery of six kilograms of cocaine.

The court finds that Trooper Bradford developed an objectively reasonable and articulable suspicion that the defendant was involved in further criminal activity while he was engaging in routine activities within the scope of the initial traffic stop. Therefore, Trooper Bradford's expansion of the scope of his initial investigation was justified under the law.

## **CONCLUSION**

For the reasons discussed above, the court finds that Trooper Bradford did not impermissibly expand the scope of the defendant's detention in violation of the defendant's Fourth Amendment rights. Therefore, the defendant's motion to suppress is DENIED.

IT IS ORDERED:

DATED this 7th day of February, 2013.

BY THE COURT:

_____
DEE BENSON
United States District Judge